# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In re the Dependency of: | ) | No. 74002-4-I |
| M.B.S. (DOB: 04/07/06), | ) | DIVISION ONE |
| Minor Child, | ) | |
| STATE OF WASHINGTON DEPARTMENT OF SOCIAL AND HEALTH SERVICES, | ) | UNPUBLISHED |
| | ) | FILED: <u>December 12, 2016</u> |
| Respondent, | ) | |
| v. | ) | |
| MARY SPEHAR, | ) | |
| Appellant. | ) | |

Cox, J. — Mary Spehar appeals the termination of her parental rights to her son, M.B.S. The trial court did not abuse its discretion by denying her motion to appoint M.B.S. independent counsel. The court did not prematurely consider M.B.S.'s best interests in determining Spehar's fitness as a parent. And there was sufficient evidence to prove that continuation of the parent-child relationship diminished this child's prospects for early integration into a stable and permanent home. We affirm.

Mary Spehar gave birth to M.B.S. in April 2006 and cared for him on her own. Since then, M.B.S. has struggled with behavioral problems, including aggressive and uncontrolled outbursts, directed at himself and others.

Therapists have diagnosed him with attention deficit hyperactivity disorder, oppositional defiant disorder, and autism spectrum disorder.

Concerned about her son, Spehar took him to a therapist in 2011 who spoke with her about parenting techniques and medication. The therapist saw M.B.S. intermittingly for two years, during which time M.B.S. exhibited some improvement.

But Spehar has issues of her own. Authorities reported seeing her threaten and yell at her son, and she seemed unable to maintain a hygienic and orderly home. She exhibited signs of paranoia and what would later be diagnosed as attention deficit hyperactivity disorder, bipolar disorder, obsessive-compulsive disorder, and polysubstance abuse.

The State removed M.B.S. from his mother's care on June 20, 2013. It commenced dependency proceedings less than a week later. The court granted the State's dependency petition and placed M.B.S. with his grandmother, Carolyn Spehar.

M.B.S.'s father relinquished his parental rights in September 2014.

The dependency order permitted Spehar to visit M.B.S. and attend his medical appointments. It also required that Spehar complete certain services, including mental health, family, and substance abuse counseling.

Spehar's compliance with these services was inconsistent. She participated in two substance abuse evaluations but did not participate in subsequent state-offered outpatient treatment for substance abuse. Instead, she

2

had "multiple relapses into substance use."[1] She also failed to participate in mental health treatment, ensure that her medical prescriptions remained current, or maintain sufficient contact with family support workers. Her contact and visitation with M.B.S. were erratic.

One of her psychologists, Dr. Jason Prinster, initially predicted that M.B.S. could return to his mother's care in the near future. After Spehar's repeated failures to comply with court-ordered rehabilitative services, Dr. Prinster updated his opinion, advising that the prospect of reunion was "guarded to poor."[2] He based this conclusion on the "mother's lack of consistent participation, if any, in his treatment recommendations."[3]

Spehar's designated mental health counselor, Dr. David Hall, noted that Spehar had proved unable to demonstrate either the "regular involvement in [M.B.S.'s] life or the emotional calmness" necessary to handle M.B.S.'s behavioral issues.[4]

Carolyn Spehar suffered a stroke in November that made her unable to care for M.B.S. alone. M.B.S. was briefly placed with her close friend, but the friend proved unable to deal with M.B.S.'s behavioral issues.

The State then placed M.B.S. at the Ruth Dykeman Children's Center (RDCC) in Burien. M.B.S.'s behavioral problems worsened at the RDCC,

---

[1] Clerk's Papers at 275.

[2] Id. at 274.

[3] Id.

[4] Id. at 400.

3

inspired by the bad example of his peers. While he improved for a time, he later regressed again after his mother, grandmother, and social worker visited for his birthday.

M.B.S. did not enjoy living at the RDCC and wanted to leave. A therapist from the RDCC later testified that M.B.S. told her that he could not be "disconnected from [his] family anymore" and that he did not "pull [his] hair when [he was] at home."[5] M.B.S. also told staff that his grandmother's presence calmed him and that he wanted to live with her.

The State then sought to terminate Spehar's parental rights. Over the course of a five day trial, various witnesses, including Spehar, testified.

On the second day of trial, M.B.S.'s guardian ad litem testified that she was not required to report to the court what M.B.S. wanted. She said she was unsure about his wishes but had heard from others that he wanted to be with his mother or grandmother.

Shortly thereafter, Spehar moved orally to stay proceedings and appoint M.B.S. an attorney. The court declined to appoint counsel at that time but invited Spehar to submit further written argument and authority on the issue. Spehar did so. The court again denied the motion.

The court terminated the parent child relationship. Its rulings are set forth in its findings of facts, conclusions of law, and order.

Spehar appeals.

---

[5] Report of Proceedings Vol. 1 (August 26, 2015) at 75.

## MOTION TO APPOINT COUNSEL

Spehar argues that the trial court improperly concluded that the Fourteenth Amendment of the United States Constitution did not require the appointment of counsel for M.B.S. We hold that the court did not abuse its discretion in denying the motion to appoint counsel for M.B.S.

We review for abuse of discretion the trial court's decision whether to appoint counsel for M.B.S. RCW 13.34.100(7)(a) provides that the trial court "may appoint" counsel under such circumstance. The legislature employed the word "may" to place this decision within the trial court's sound discretion.[6] The trial court abuses its discretion when its "'decision is manifestly unreasonable or based upon untenable grounds.'"[7]

> A court's decision is manifestly unreasonable if it is outside the range of acceptable choices, given the facts and the applicable legal standard; it is based on untenable grounds if the factual findings are unsupported by the record; it is based on untenable reasons if it is based on an incorrect standard or the facts do not meet the requirements of the correct standard.[8]

Spehar's contrary argument that we should review de novo the trial court's decision is unpersuasive. She cites a dissent in Gourley v. Gourley, stating that de novo review was appropriate where a court's discretionary choice required consideration of constitutional due process.[9] That is not a position that the

---

[6] In re Dependency of M.S.R., 174 Wn.2d 1, 11-12, 271 P.3d 234 (2012).

[7] Mayer v. City of Seattle, 102 Wn. App. 66, 79, 10 P.3d 408 (2000).

[8] In re the Marriage of Lawrence, 105 Wn. App. 683, 686 n.1, 20 P.3d 972 (2001).

[9] 158 Wn.2d 460, 479, 145 P.3d 1185 (2006) (Sanders, J., dissenting).

majority adopted in that case. Likewise, we have found no other Washington case that departs from the abuse of discretion standard of review that is generally applicable to discretionary rulings.

Spehar later cites a Wyoming case that declared de novo the appropriate standard of review without meaningful analysis.[10] Thus, that case does not persuade us to depart from the abuse of discretion standard.

In considering whether to appoint counsel for a child in a termination hearing, the trial court must conduct a three-part balancing test.[11] The United States Supreme Court developed that test in Mathews v. Eldridge as the appropriate framework for measuring the necessary protections of procedural due process.[12] That test requires that the court weigh three factors: (1) the private interests at stake in a given proceeding; (2) the government's interest; and (3) the risk that the extant procedures will lead to erroneous deprivations of a private right.[13]

The Washington supreme court recently applied the Mathews test to resolve whether the Fourteenth Amendment protects the right of children to counsel in termination hearings in In re Dependency of M.S.R.[14]

---

[10] Dep't of Family Servs. v. Currier, 295 P.3d 837, 839-40 (Wyo. 2013).

[11] M.S.R., 174 Wn.2d at 14-15.

[12] 424 U.S. 319, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976).

[13] Id. at 335.

[14] 174 Wn.2d 1, 271 P.3d 234 (2012).

As to the first factor, the relevant private interests, the court concluded that children have a serious liberty interest at stake in proceedings to terminate parental rights.[15] As to the second factor, the State's interest, the court recognized the State's "urgent interest in the welfare of the child" and in obtaining "an accurate and just decision."[16]

Turning to the last factor, the risk of erroneous deprivation, the court explained that the proper focus for consideration is the relevant "child's individual and likely unique circumstances."[17] In looking to those circumstances, the court held that "whether there is a constitutionally significant risk of an erroneous deprivation of rights may also turn on whether there is someone in the case who is able to represent the child's interests or whose interests align with the child's."[18]

In answering that question, the court recognized that "the existing statutory scheme for termination proceedings" provides numerous procedural safeguards.[19] These include "a full evidentiary trial before a superior court judge with discovery, motions practice, heightened burden of proof, and appellate review."[20] Additionally, the trial court must appoint a guardian ad litem for each

---

[15] Id. at 17-18.

[16] Id. at 18 (internal citation omitted).

[17] Id. at 22.

[18] Id. at 18.

[19] Id.

[20] Id.

child who must advocate for the child's best interests and inform the court of any "views or positions expressed by the child on issues pending before the court."[21]

Yet the supreme court recognized that in certain circumstances, appointment of a guardian ad litem might be insufficient. In doing so, it took account of the argument posed by M.S.R.'s parent, Nyakat Luak, that a guardian ad litem's duty to convey the child's "expressed desires" did not equate to representation of those desires.[22] Luak also argued that a well-intentioned guardian might seek to block a child's testimony based on the "misguided view that participation will be harmful" to the child.[23] She argued that an attorney, by contrast, would advocate for the child's desires and could maintain confidential communications with the child to allow for the child's open disclosure of his "deepest secrets and concerns."[24]

The court recognized the force of Luak's argument but declined to find a universal right to counsel under such circumstance. Instead, it explained that "[i]ndeed, each child's circumstances will be different."[25] Weighing the three Mathews factors, the court concluded that the Fourteenth Amendment required

---

[21] Id. at 20 (citing RCW 13.34.105(1)(b), (f)).

[22] Id. at 19.

[23] Id.

[24] Id.

[25] Id. at 21.

appointment of counsel for a child on a case-by-case basis, determined by "each child's individual and likely unique circumstances."[26]

Here, Spehar argues there was a large risk of error in the evidentiary hearing that appointment of counsel would have mitigated. We disagree.

The Mathews test asks the court to balance the private and State interests at stake against the risk of erroneous decisions absent further procedural safeguards.[27] That test controls our analysis in this case.

The parties do not dispute the gravity of the respective private and State interests. Thus, their argument focuses upon the risk of erroneous decision in the absence of the additional procedure of providing independent counsel for M.B.S.

Here, the trial court determined that appointment of counsel would not meaningfully add to already extensive safeguards. It based this conclusion on four reasons. First, the case did not present any complex legal issues. Second, there was not much an attorney could have assisted with in such a case. Third, the guardian ad litem adequately accounted for M.B.S.'s actual interests. Fourth, the motion was untimely.

Spehar does not contest the trial court's first reason. We see no basis to do so.

Regarding the second reason, the trial court concluded that the particular circumstances of this case presented little need for M.B.S. to have independent

---

[26] Id. at 22.

[27] 424 U.S. at 335.

counsel. Spehar argues an attorney for M.B.S. "could have presented evidence, cross-examined witnesses, and provided argument to the court on how it should resolve matters."[28] She also argues such an attorney could have advocated for guardianship with Carolyn. We are not persuaded that the presence of counsel would have changed the course of the proceedings in this case.

Spehar's attorney skillfully advocated against the termination of parental rights. In cross-examination, he challenged the guardian ad litem on the performance of her duties, raising the issue present in this appeal. He provided legal argument to the court that appointment of independent counsel for M.B.S. was appropriate. In both instances, he argued for interests aligned with M.B.S.'s own interests.

Additionally, the possibility of a petition for guardianship would not bear upon the outcome in this case because such an interim guardianship would fail to provide permanence for M.B.S., as discussed more fully below. In light of these facts, the presence of additional counsel for M.B.S. would not have materially altered these proceedings.

Spehar also disputes the trial court's third reason for declining to appoint M.B.S. counsel: that the guardian ad litem adequately represented M.B.S.'s actual interests. We disagree with her challenge.

This court has recognized that the trial court is in the best "position to make an objective judgment" whether representation is adequate.[29] Even if the

---

[28] Appellant's Opening Brief at 35.

[29] Marquardt v. Fein, 25 Wn. App. 651, 657, 612 P.2d 378 (1980).

guardian ad litem performs her duty imperfectly, the appellate court will not reverse unless that imperfection altered the trial court's determination.[30]

Here, the guardian ad litem incorrectly believed that she was not required to report M.B.S.'s actual wishes to the court. The guardian ad litem never actually spoke to M.B.S. about the matter. Further, although the guardian ad litem and certain witnesses testified to M.B.S.'s interests, no one in this litigation advocated for those interests.

But the trial court determined that the breach was harmless because the guardian ad litem ultimately reported M.B.S.'s actual and expressed wishes. Spehar fails to indicate how this belated report prevented the court from considering those wishes. This record shows that the trial court considered M.B.S.'s wish to live with his grandmother and recognized that Carolyn was willing to serve as his guardian.

Spehar argues that the balance of these three factors, the private interest, state interest, and risk of erroneous determination, supports the appointment of counsel for M.B.S. We disagree.

The first two factors of the Mathews test weigh against each other equally. The interests of both M.B.S. and the State are stark and similar. They focus on M.B.S.'s welfare and seek an accurate and just resolution.

The third factor, the risk of erroneous determination based on the particular circumstances of this case, tips the balance in the State's favor. The issues in this case were not legally complex. Spehar fails to identify persuasively

---

[30] In re Welfare of T.B., 150 Wn. App. 599, 615-16, 209 P.3d 497 (2009).

how an attorney might have swayed the court's decision on Spehar's parental fitness. And while the guardian ad litem misunderstood her duty to convey M.B.S.'s actual wishes to the court, this error was harmless. Thus, we conclude that the trial court did not abuse its discretion in declining to appoint M.B.S. independent counsel.

Because we find the trial court's denial of the motion to appoint counsel a proper exercise of discretion, we need not reach the fourth reason, that the motion was untimely.

## CURRENT UNFITNESS AND BEST INTEREST

We turn to the merits of the trial court's decision to terminate parental rights. As a preliminary matter, Spehar contends that the lower court misapplied the two-step scheme for this determination, prescribed by RCW 13.34.180, by prematurely addressing M.B.S.'s best interest at the first step. We disagree.

RCW 13.34.180 provides a two-step process to terminate parental rights. First, the court must determine whether the parent is unfit to maintain her rights.[31] This determination relies on six statutory factors, each of which the State must prove by clear, cogent, and convincing evidence.[32]

---

[31] RCW 13.34.180(1).

[32] In re Dependency of K.N.J., 171 Wn.2d 568, 576-77, 257 P.3d 522 (2011).

The determination of a parent's fitness to parent her child concerns the determination of a fundamental right.[33] Thus, we consider de novo whether a trial court conducted that determination properly.[34]

Only after the trial court finds that the natural parents are unfit to maintain their rights does the court continue to the second step of analysis, focusing on the child's best interests.[35]

In In re Welfare of A.B., the supreme court set aside a termination of parental rights based on a "premature" consideration of the child's best interests.[36] In that case, the trial court considered the termination of Rogelio Salas's parental rights.[37] It terminated those rights and found that A.B.'s best interests would be better served by placement with his mother's cousin.[38] "Nowhere in its opinion did the court state that [the father] was then unfit to parent."[39]

Thus, the supreme court determined that the trial court had "obviously focus[ed] on A.B.'s best interests, as opposed to [the father's] current unfitness."[40] The supreme court concluded that the trial court erred and that its

---

[33] In re Welfare of A.G., 160 Wn. App. 841, 843-44, 248 P.3d 611 (2011).

[34] Id.

[35] In re Welfare of A.B., 168 Wn.2d 908, 925-26, 232 P.3d 1104 (2010).

[36] 168 Wn.2d 908, 925-26, 232 P.3d 1104 (2010).

[37] Id.

[38] Id. at 916.

[39] Id. at 917.

[40] Id. at 926.

findings could not support the termination of Salas's parental rights.[41]

Accordingly, the court set aside the termination of Salas's parental rights based

on the trial court's "premature" consideration of A.B.'s best interest.[42]

Here, Spehar contends that three of the trial court's findings are defective

for the same reason—because they incorporate premature consideration of

M.B.S.'s best interest. In finding of fact 2.25, the court found that the current

"status quo" posed by the uncertainty of M.B.S.'s placement potential was not in

the child's best interests. In findings of fact 2.24 and 2.26, the court found that

terminating the parent-child relationship and initiating the placement process

would further M.B.S.'s best interests by enabling his placement with adoptive

parents competent to handle his behavioral issues.

We see no basis in A.B. to approach the findings of fact in this case in

such piecemeal fashion, concluding some to be premature and not others. Here,

unlike in A.B., the trial court made numerous findings of fact that went directly

and solely to Spehar's fitness to parent. Thus, even if we concluded the findings

Spehar identifies were defective as argued, we would still conclude the trial

court's decision rested upon substantial evidence.

## SUFFICIENCY OF EVIDENCE

Spehar also argues that the court lacked substantial evidence to find that

the State satisfied RCW 13.34.180(1)(f). We disagree.

---

[41] Id. at 927.

[42] Id.

14

As noted above, the trial court must find this element met by clear, cogent, and compelling evidence.[43] We review de novo whether it did so.[44] But we will affirm the trial court if its conclusion is supported by substantial evidence.[45] Evidence is substantial if "any rational trier of fact, viewing the evidence in the light most favorable to the [prevailing party below] could find" the necessary elements met by clear, cogent, and compelling evidence.[46]

Under RCW 13.34.180(1)(f), the petition for termination of parental rights must show that the "continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home."

Division Two of this court explained that the State can prove this factor in one of two ways.[47] First, the State can prove that prospects exist for a permanent home but that the legal parent-child relationship prevents that placement.[48] Second, the State can show that the parent-child relationship has a "damaging and destabilizing effect on the child" that would impair the child's integration into a permanent and stable placement.[49]

---

[43] K.N.J., 171 Wn.2d at 576-77.

[44] A.G., 160 Wn. App. at 843-44.

[45] State v. Cardenas-Flores, 194 Wn. App. 496, 510, 374 P.3d 1217 (2016).

[46] Id.

[47] In re Welfare of R.H., 176 Wn. App. 419, 428, 309 P.3d 620 (2013).

[48] Id.

[49] Id.

Regarding the first alternative, Spehar argues that the court never found that actual placement prospects existed. The State does not rebut this argument by explaining that any alternative placements existed. Thus, the State must satisfy the second alternative—that the parent-child relationship had a damaging and destabilizing effect on M.B.S.—in order to prevail. The State meets this burden.

The State argues that it provided substantial evidence to the trial court that Spehar's relationship with M.B.S. has had a "damaging and destabilizing effect on the child" that would impair the child's integration into a permanent and stable placement. We agree.

The trial court found Spehar "incapable of providing for [M.B.S.]'s emotional, physical, mental, and developmental needs."[50] Spehar had, in the court's estimation, "little insight into how her parental deficiencies and numerous failures to participate in rehabilitation impacted [M.B.S.]"[51] Drs. Prinster and Hall provided the same assessment in their testimony, based upon Spehar's failure to participate in court ordered services.

Although Spehar shared a strong bond with her son and was nurturing and attentive to his needs, she often fell into crippling bouts of depression, anxiety, and addiction. M.B.S.'s service providers testified that M.B.S. could not safely return to Spehar until she demonstrated the willingness to engage in court-ordered services.

---

[50] Clerk's Papers at 278.

[51] Id.

The State also argues that Spehar's visits may have exacerbated her son's own anxiety and behavioral issues. We conclude that substantial evidence supports this argument.

The State also argues the parent-child relationship created uncertainty for M.B.S. that caused him destabilizing anxiety. The supreme court has previously held that the child's "feelings of insecurity and instability" are relevant to the trial court's determination of parental fitness.[52]

Here, the trial court found that the uncertainty of the "child's next placement" inhibited M.B.S.'s emotional and psychological welfare. This realization played an appropriate role in the trial court's determination that the parental relationship had a damaging and destabilizing effect on M.B.S.

Spehar argues that the court paid insufficient credence to her plan to share parenting responsibilities with M.B.S.'s grandmother, Carolyn. Carolyn was willing to serve as a permanent guardian for M.B.S. but, due to her recent stroke, would need Spehar's assistance.

We previously concluded that the impact of similar possible guardianship arrangement was irrelevant to the RCW 13.34.180(1)(f) analysis in In re the Dependency of A.V.D.[53] A.V.D. had lived her entire life with her grandparents.[54] Her father, Mark VanDam, visited often, maintaining a regular and loving

---

[52] Matter of Dependency of Esgate, 99 Wn.2d 210, 214, 660 P.2d 758 (1983).

[53] 62 Wn. App. 562, 570, 815 P.2d 277 (1991).

[54] Id. at 567.

relationship with his daughter.[55] Given this situation, VanDam argued that a guardianship with the grandparents would give A.V.D. the permanency and stability contemplated by RCW 13.34.180, without depriving her of a father.[56] We disagreed, concluding that guardianship was an inherently temporary option, allowing the parent later to seek a modification.[57] Thus, we affirmed the termination of VanDam's rights.[58]

These same concerns apply in this case. Here, M.B.S. lived with his grandmother until she suffered a stroke. The trial court recognized her willingness to serve as guardian to M.B.S. with Spehar's assistance. M.B.S. and Spehar previously lived with his grandmother for two years, and Spehar argues that M.B.S. should live with her now.

The State's action in this matter and the trial court's determination rested in large part on the unpredictable inconsistency of Spehar's conduct. The trial court recognized the deep and nurturing love Spehar holds for her son. Yet anxiety, depression, and addiction often made her unable to properly parent M.B.S. While she may now support granting her mother custody as M.B.S.'s guardian, she may come to change her mind. Based on that possibility, clear, cogent, and compelling evidence supports the trial court's conclusion in regards to RCW 13.24.180(1)(f).

---

[55] Id.

[56] Id. at 570.

[57] Id.

[58] Id. at 574-75.

## CONSTITUTIONAL CHALLENGE

Spehar argues that article I, section 3 of the Washington Constitution requires the universal appointment of counsel to represent each child in every termination proceeding. This is an express challenge to the constitutionality of RCW 13.24.100(7)(a) that grants discretion to trial courts to appoint counsel on a case-by-case basis. Assuming, without deciding, that this statute is unconstitutional, its application to this case was harmless beyond a reasonable doubt. Accordingly, we reject this claim.

We review de novo a statute's constitutionality.[59] We presume that a statute is constitutional and one who challenges the statute bears the burden to show beyond a reasonable doubt that it is not constitutional.[60] In considering this issue, we also look to "the fundamental principle that if a case can be decided on nonconstitutional grounds, an appellate court should refrain from deciding constitutional issues."[61]

The supreme court concluded that the statutory predecessor to RCW 13.34.100(7) satisfied the federal constitution.[62] It did not reach the question of whether it complied with the due process clause of the Washington constitution. The parties in that case had not provided the appropriate State v. Gunwall

---

[59] M.S.R, 174 Wn.2d at 13.

[60] Amunrud v. Bd. of Appeals, 158 Wn.2d 208, 215, 143 P.3d 571 (2006).

[61] Isla Verde Int'l Holdings, Inc. v. City of Camas, 146 Wn.2d 740, 752, 49 P.3d 867 (2002).

[62] M.S.R, 174 Wn.2d at 23.

analysis, thus depriving the court of the opportunity to consider that issue.[63] In Gunwall, the court provided the appropriate test for considering whether the Washington constitution provides different protections than its federal counterpart.[64]

Here, the parties have briefed the Gunwall analysis. But as discussed above, the trial court's decision to not appoint counsel for M.B.S. was harmless beyond a reasonable doubt even if it was constitutionally erroneous. Even if an attorney had been appointed to advocate for M.B.S.'s wish to live with his grandmother, the evidence would still support termination.

Accordingly, even if the Washington Constitution guaranteed M.B.S. the right to counsel, a question we need not decide, the failure to appoint such counsel was harmless beyond a reasonable doubt.

We affirm the order terminating Spehar's parental rights.

Cox, J.

WE CONCUR:

Spearman, J.

Appelwick, J.

___

[63] 106 Wn.2d 54, 720 P.2d 808 (1986).

[64] Id. at 58-59.